### Ginger C. BURICH, Plaintiff and Appellee,

v.

### Jeffrey Edward BURICH, Defendant and Appellant.

### Civ. No. 9992.

Supreme Court of North Dakota.

Dec. 30, 1981.

Freed, Dynes, Malloy & Reichert, Dickinson, for plaintiff and appellee; argued by George T. Dynes, Dickinson.

Beyer & Holm, Dickinson, for defendant and appellant; argued by Tom M. Beyer, Dickinson.

ERICKSTAD, Chief Justice.

■ Jeffrey Burich appeals from an order for amended judgment concerning custody, visitation rights, and change of residence of minor children made by the District Court of Stark County. Because Jeffrey has not appealed from a final judgment, we dismiss and thereby affirm the judgment of the district court.

Notwithstanding that Jeffrey failed to appeal from a final judgment or an order appealable pursuant to Section 28–27–02, N.D.C.C., we have allowed Jeffrey to present oral argument as though he were appealing from the amended judgment. In addition, we have read and considered the merits of such issues raised by Jeffrey in his brief. Because the time for taking an appeal of the final amended judgment has elapsed and thus the merits of those issues could not otherwise be reached, we have, in the interests of justice, considered those issues and have determined that they are not meritorious. *State v. Gasser*, 306 N.W.2d 205 (N.D.1981). We do this with a caveat that our review of the merits shall not be considered a precedent in the future.

This case involves the marriage of Jeffrey Burich and Ginger Burich, the birth of three children during the course of their nine-year marriage, the subsequent divorce and remarriage by Ginger Burich, and the removal of the children by Ginger Burich from North Dakota to Kansas. Jeffrey Burich's main assertion on this appeal is that Ginger should not have been allowed to remove the children from the State of North Dakota because the move deprives him of his visitation rights, resulting in interruption of his parental influence on the children.

The decision precipitating this appeal results from an application by Ginger Burich in the District Court of Stark County for an order permitting change of residence of the minor children. That application was dated January 26, 1981, and hearings were held before the court on March 16, 1981, and April 3, 1981. The oral testimony heard by the court during those two hearings was by Ginger Burich and Jeffrey Burich, both of whom were cross-examined. Much of the evidence was presented in the form of affidavits. Approximately 49 affidavits were received by the court from about 35 different persons. The affidavits were made by the parties, parents of the parties, Ginger's current husband, friends of the parties, experts in the oil business, a doctor, a counselor, and a priest. Jeffrey Burich also submitted affidavits in response to the affidavits presented on behalf of Ginger. The trial court made no findings of facts and the judgment roll does not include a recorded oral decision. Ginger's counsel, however, stated in open court during the oral argument that the transcript was incomplete and that if the court desired it was possible to secure such a complete transcript. That completed transcript could include findings made orally by the trial court at the conclusion of the hearing. Such a possibility is supported by the fact that the written order for amended judgment states "the Court announced its decision orally."

The trial court in this case issued an order amending the original divorce judgment. That order, in addition to continuing the custody of the children in Ginger, authorized her to change their residence from North Dakota to Sedan, Kansas. The remainder of the order modified the visitation rights and support obligation of Jeffrey as follows:

"IV.

"The three minor children shall have the opportunity to be with their father for a period of six (6) weeks during each summer, commencing on or about June 15th of each year, starting with 1981, and to be for a continuous period thereafter of 42 days. During such period of time the Defendant shall have the custody and control of said minor children and they shall be transported to Belfield, North Dakota for said 42-day period at the expense of the Plaintiff. Similarly, the Plaintiff shall be responsible for the expense of returning said children home to Sedan, Kansas, after the 42-day period has elapsed. During such time that the

children are in Belfield, the Plaintiff shall have reasonable visitation rights and also it is anticipated that the children will be allowed to visit with and spend time with both their paternal and maternal grandparents as well as other friends and relatives in the Belfield area.

"V.

"That for a period of 7 consecutive days over the Christmas holiday every other year, the children will visit their father in Belfield or elsewhere as he may determine, with all expenses of and arrangements for transportation and support during that period to be the responsibility of the Defendant. The first Christmas visitation to be exercised by the Defendant shall be over the Christmas holiday of 1981 and shall include both Christmas eve and Christmas day in the 7-day visitation period. It is understood, however, that such visitation period shall not interfere with the childrens' school in any respect.

"VI.

"Other than the specific periods mentioned herein, during which time the children shall visit their father, they shall remain in the care, custody and control of the Plaintiff, subject to reasonable visitation rights to be exercised by the Defendant at reasonable times and upon reasonable advance notice to the Plaintiff.

"VII.

"During the 42-day period each summer the children shall be with their father in Belfield, North Dakota, the Defendant's support obligation shall be reduced to one-third (⅓) of the regular amount and rather than being $175.00 per child per month, shall be, during that period only, reduced to $58.33 per child. During such time, except for the travel expenses both ways which shall be paid by the Plaintiff, the Defendant shall be responsible for all day to day support expenses of the three children."

Jeffrey Burich contends that the trial court erred in allowing Ginger Burich to move the three children to Sedan, Kansas. He urges this court to interpret Section 14–09–07 of the North Dakota Century Code to require a showing of "exceptional circumstances" by the custodial parent before that parent is allowed to remove the children from the state of residence of the noncustodial parent.

Ginger Burich argues that Section 14–09–07, N.D.C.C., requires the court to allow whatever is in the best interests of the children. She argues that the trial court correctly determined that her move to Sedan, Kansas, to be with her new husband was in the best interests of the children and thus was not error. We agree.

■ A custodial parent is allowed to change the residence of a child to another state subject to the provisions of Section 14–09–07, N.D.C.C.:

"A parent entitled to the custody of a child shall not change the residence of the child to another state except upon order of the court or with the consent of the noncustodial parent, where the noncustodial parent has been given visitation rights by the decree; however, a court order shall not be required if the noncustodial parent has not exercised such visitation rights for a period of one year."

Prior to 1979 that section of the North Dakota Century Code read as follows:

"A parent entitled to the custody of a child has a right to change his residence, subject to the power of the district court to restrain a removal which would prejudice the rights or welfare of the child."

■ Therefore, prior to the 1979 amendment of Section 14–09–07, N.D.C.C., a custodial parent had a statutory right to change a child's residence to another state subject to the district court's authority to restrain the removal of such child. The burden was placed on the noncustodial parent to seek a restraining order to prevent the custodial parent from moving the child out of state. Now the burden of securing an order for a change in residence of a child

appears to be upon the custodial parent. The best interests of the child, however, should still be the primary issue in deciding whether or not a change in residence of the child should be permitted. It is interesting to note what Representative Wayne Stenehjem, co-sponsor of the bill amending Section 14–09–07, N.D.C.C. (H.B. 1585), said in his appearance before the Senate Committee on Social Welfare and Veterans Affairs. Generally, it was his view that this bill would encourage judges to look into a case a little deeper to "determine what is truly best for the child." Minutes of Committee on Social Welfare and Veterans Affairs, March 2, 1979.

We have repeatedly held that the best interests and welfare of the child must dictate custody in divorce actions. *Lapp v. Lapp*, 293 N.W.2d 121, 125 (N.D.1980). The North Dakota Century Code, at Section 14–09–06.2, lists 10 factors which are to be considered by the court in determining the best interests and welfare of the child.[1] That section provides further:

"In any proceeding under this chapter, the court, at any stage of the proceedings after final judgment, may make orders about what security is to be given for the care, custody, and support of the unmarried minor children of the marriage as from the circumstances of the parties and the nature of the case is equitable." § 14–09–06.2, N.D.C.C.

This action involves the custody of three minor children born to Ginger and Jeffrey Burich before their divorce and is a proceeding under Chapter 14 of the North Dakota Century Code. We continue to adhere to our view that in all actions involving child custody, the issue is: "What are the best interests of the child?" or, in other words, "What disposition serves the best interests of the child?"

A review of case law from other jurisdictions indicates that courts consider the best interests of the child as the primary consideration in determining whether or not a custodial parent may change the residence of the child. The South Dakota Supreme Court in *Matter of Ehlen*, 303 N.W.2d 808, 810 (S.D.1981), said:

"The majority of cases dealing with removal of a child from the jurisdiction support the rule that if a parent who has custody of a child has good reason for living in another state, removal will be permitted, providing such a move is consistent with the best interests of the child."

South Dakota has a statute which requires that the court consider the best interests of a child prior to permitting a custodial parent to change the child's residence. In *Matter of Ehlen*, the South Dakota Supreme Court permitted the custodial mother to

---

1. "For the purpose of custody, the best interests and welfare of the child shall be determined by the court's consideration and evaluation of all factors affecting the best interests and welfare of the child. These factors include all of the following when applicable:

1. The love, affection, and other emotional ties existing between the parents and child.
2. The capacity and disposition of the parents to give the child love, affection, and guidance and to continue the education of the child.
3. The disposition of the parents to provide the child with food, clothing, medical care, or other remedial care recognized and permitted under the laws of this state in lieu of medical care, and other material needs.
4. The length of time the child has lived in a stable, satisfactory environment and the desirability of maintaining continuity.
5. The permanence, as a family unit, of the existing or proposed custodial home.
6. The moral fitness of the parents.
7. The mental and physical health of the parents.
8. The home, school, and community record of the child.
9. The reasonable preference of the child, if the court deems the child to be of sufficient intelligence, understanding, and experience to express a preference.
10. Any other factors considered by the court to be relevant to a particular child custody dispute.

"In any proceeding under this chapter, the court, at any stage of the proceedings after final judgment, may make orders about what security is to be given for the care, custody, and support of the unmarried minor children of the marriage as from the circumstances of the parties and the nature of the case is equitable." § 14–09–06.2, N.D.C.C.

have the children accompany her to Washington State where she and her husband were living with family friends. The trial court found that the mother and her husband were going to become employed in that area, and that they would see that the children were enrolled in school and involved in sporting and cultural activities. The South Dakota Supreme Court affirmed the trial court's decision modifying the previous custodial and visitation arrangements. The modification provided for more liberal visitation privileges.

The Supreme Court of Oregon in *Matter of the Marriage of Smith and Smith*, 290 Or. 567, 624 P.2d 114 (1981), determined that it was in the best interests of the children to deny the custodial mother an opportunity to remove the children from Oregon to California, where her new husband was residing. The trial court found that the best interests of the children would be served by staying in Oregon, either with their mother, or, if she moved to California, with their father. The trial court stated that it did not believe the children would "tolerate the disruption" well. *Id.* A clinical psychologist specializing in children testified that he was "overwhelmingly in favor of maintaining the situation and not having them moved." *Id.* The Oregon Supreme Court, therefore, affirmed the trial court's order that if the mother moved from Oregon, custody would be awarded to the father.

Jeffrey Burich urges this court to adopt the "exceptional circumstances" test used by the Court of Appeals of New York. *Weiss v. Weiss*, 52 N.Y.2d 170, 436 N.Y.S.2d 862, 418 N.E.2d 377 (1981). The New York Court of Appeals in *Weiss* placed the emotional well-being of the child in the fore as a consideration in determining whether or not a custodial parent could change the residence of the child. It stated that the protection of the child's emotional well-being should not be dependent on the vindication of the visitation rights of the parents. The court did, however, state that the parents' rights are also to be considered. The court said:

"Children are not exempt from the dislocation that almost inevitably is imposed on both the young and the adult members of a family affected by divorce. But, in pursuit of society's desire to shield a youngster from ensuing disruptions, the law does not insist that the parents make every possible sacrifice, no matter how disproportionate it may be to the benefit it would bestow on the child. The parents too are entitled to consideration. Always remembering the formative aspects of childhood, the quest, if possible, is for a reasonable accommodation of the rights and problems of both." 436 N.Y. S.2d at 866, 418 N.E.2d at 381.

The Court of Appeals concluded that the custodial mother's proposed migration to Las Vegas, where she hoped to make a "new life" was not the type of exceptional circumstance which would allow the mother to change the residence of the child. The mother had no unique, or even firm, vocational offer in Las Vegas. The court indicated that an exceptional circumstance may be created in a case where the custodial parent remarries: "And, as we know, this is not a case where the obligations undertaken by a divorced parent who marries anew require a dramatic change of locale." *Id.*

██ Jeffrey Burich argues that his visitation rights were infringed upon by the court's order permitting Ginger to change the residence of the children from North Dakota to Kansas. In North Dakota, visitation privileges are created to promote the best interests of the child. We commented on visitation privileges in *Gardebring v. Rizzo*, 269 N.W.2d 104, 110 (N.D.1978), as follows:

"The adoption of the theory that the non-custodial parent should have no legally enforceable right of visitation would represent a major shift in policy in this state. The policy that has been followed in this state is in accord with the policy applied by the Wisconsin Supreme Court in *Marotz v. Marotz*, 80 Wis.2d 477, 259 N.W.2d 524 (1977).

'It is a fundamental principle in this state that visitation privileges, like cus-

todial rights, are created to promote the best interests of the child. *Neblett v. Neblett*, 274 Wis. 574, 571 [sic], 81 N.W.2d 61 (1957). As we stated in *Patrick v. Patrick*, 17 Wis.2d 434, 439, 117 N.W.2d 256, 259 (1962):

"Minor children are entitled to the love and companionship of both parents insofar as this is possible and consistent with their welfare."

For this reason, visitation privileges granted to the non-custodial parent must not be viewed merely as a privilege of that parent, but as a right of the child which is not to be subverted by the custodian.' 80 Wis.2d at 486, 259 N.W.2d at 529–30.

"We believe that the theory that the non-custodial parent should have no legally enforceable right of visitation represents such a shift in policy in North Dakota that the question of whether or not it should be adopted should be left to the legislature."

Since *Gardebring*, the North Dakota Legislature has adopted Subsection (2) of Section 14–05–22, N.D.C.C., regarding visitation rights. That subsection provides as follows:

"2. After making an award of custody, the court shall, upon request of the noncustodial parent, grant such rights of visitation as will enable the child and the noncustodial parent to maintain a parent-child relationship that will be beneficial to the child, unless the court finds, after a hearing, that visitation is likely to endanger the child's physical or emotional health."

The North Dakota State Legislature, then, has acted consistent with our opinion in *Gardebring*. We can discern in none of the amendments a desire on the part of the Legislature to vary the ultimate issue, *i.e.*, what is in the best interests of the child.

In determining the best interests of a child, the trial court must consider the factors listed in Section 14–09–06.2, N.D.C.C. We believe that the factors impliedly recognize a child's need for a meaningful relationship with both his mother and his father. That need is met not only by daily contact with the custodial parent, but also by meaningful visitations with the noncustodial parent.

The trial court permitted Ginger Burich to change the residence of the three children from North Dakota to Sedan, Kansas. At the same time, the court modified visitation so that the children will have an opportunity to be with their father, Jeffrey Burich, for a longer period of time during each summer. Ginger Burich is responsible for the expense of returning the children from Sedan, Kansas, to visit their father. The court also granted visitation rights during every other Christmas holiday, during which time Jeffrey Burich will have custody of the children for seven consecutive days.

The trial court did not make findings of facts. We have held that the trial court's determinations on matters of child custody are treated as findings of fact. *Larson v. Larson*, 294 N.W.2d 616, 617 (N.D.1980), *Lapp v. Lapp*, 293 N.W.2d 121, 124 (N.D. 1980), *Hegge v. Hegge*, 236 N.W.2d 910, 914 (N.D.1975). The trial court granted Ginger continued custody of the three minor children and allowed her to change the residence of the minor children from North Dakota to Sedan, Kansas. Implicit in that decision is a finding that the best interests of the children were served by the move to Sedan, Kansas.

A review of the evidence indicates that the trial court could reasonably have concluded that Jeffrey has alcohol problems, is financially distressed and is behind hundreds of dollars in his child support payments, and, accordingly, any offer on his part to fund a workover rig would be more wishful thinking than reality. Additionally, the court could have reasonably concluded from the evidence that Swinney's new business in Kansas has materialized, and accordingly that Swinney, the step-father, will have an income to support his wife and her children in Kansas. This would be significant when considering the best interests of the children.

Jeffrey Burich argues that he will be denied the ability to visit his children because of the distance between his home in North Dakota and their residence in Sedan, Kansas. We believe, however, that the trial court considered the need of the children to continue a good relationship with their father and sought to foster such a relationship by allowing liberal visitation during the summer months and vacations of the children. The trial court ordered Ginger Burich to pay for the children's trip back to North Dakota to visit their father during the summer. Additionally, the trial court reduced support payments during the months in which the children will be living with their father. These conditions indicate the court considered the practical problems of visitation affected by a change of residence of the children and acted to lessen the hardships resulting therefrom.

Although Jeffrey Burich argues vigorously that his visitation rights have been imposed upon by the trial court's ruling allowing the children to move to Kansas, the record discloses that he was not diligent in visiting the children before they moved. Jeffrey Burich testified at the April 3, 1981, hearing that he had not talked with his children for four months prior to that hearing. Although he testified that he did not have the telephone number to contact the children, he also testified that he had not attempted to get their telephone number through directory assistance. Ginger Burich testified that she and the children moved to Sedan, Kansas, to be with her new husband, John Swinney. Swinney moved to Kansas to purchase a workover rig with which to work in the oil fields. Jeffrey Burich argues that there is a greater demand for workover rigs in North Dakota than in Kansas, and, therefore, John Swinney should be required by the court to stay in North Dakota. Ginger Burich contends that Swinney had greater opportunities in Kansas because of the availability of financing for the purchase of his workover rig. Jeffrey Burich counters by arguing that he and his father both offered to finance Swinney's purchase of a workover rig in North Dakota. We suspect that a business partnership, even limited to financing, between Swinney and his wife's divorced husband, would start with a crack in its foundation. It would likely fail, and this would consequently adversely affect the children, or so the trial court could reasonably have concluded.

Affidavits made by the teachers of Ryan and Brad Burich indicate that both are healthy, happy, and adjusting well to their move to Kansas. There is nothing in the record to indicate that Kalee, the three-year-old daughter, is suffering from the move or will suffer therefrom.

The record is replete with affidavits indicating that Ginger Burich is a good mother. There are also many affidavits indicating that Jeffrey Burich is a good father and spent time with the children, taking them camping and participating in outdoor activities. The undisputed testimony, however, is that Jeffrey Burich did not exercise his visitation rights for nearly four months, and, additionally, let the birthday of one of the children pass by without even acknowledging it with a birthday card or telephone call.

█ If this appeal were properly here from the amended judgment permitting removal of the children to Kansas, we would likely, because the court made no specific findings relative to the best interests of the children, be obligated to either reverse the amended judgment and remand for a new hearing on that issue, or remand for the making of such findings. *DeForest v. DeForest*, 228 N.W.2d 919 (N.D.1975). Our review of the evidence consisting of the testimony and the affidavits, however, indicates that the trial court could reasonably have concluded therefrom that permitting the removal of the children was in the best interests of the children.

For the reasons stated in this opinion, the appeal is dismissed.

SAND, PAULSON, PEDERSON and VANDE WALLE, JJ., concur.