**Mary Jane ALVAREZ, f/k/a Mary Jane Carlson, f/k/a Mary Jane Pecka, Plaintiff and Appellee,**

v.

**Steven Robert CARLSON, Defendant and Appellant.**

Civ. No. 940094.

Supreme Court of North Dakota.

Dec. 2, 1994.

Thomas E. Merrick (argued), Paulson & Merrick, Jamestown, for plaintiff and appellee.

Michael L. Gjesdahl (argued), Fargo, for defendant and appellant.

MESCHKE, Justice.

Steven Carlson appeals from an order denying his motion to amend the child custody placement of a divorce decree. We affirm, but remand for clarification of the visitation schedule.

Mary Alvarez and Steven were divorced in Hawaii on April 27, 1988. Mary received custody of their two children, Daniel and Christine. On July 2, 1988, Steven kidnapped the children and kept them secreted from Mary for over nine months. Authori-

ties finally located Steven and the children in Colorado when Steven had a traffic accident. Steven was extradited to Hawaii, where he pleaded no contest to a criminal charge of custodial interference.

The children were returned to Mary, who moved to North Dakota. In November 1989 Steven asked the local North Dakota trial court to change the children's custody to him. Daniel, then ten years old, expressed his preference to live with Steven, but the court concluded that Daniel was too young to express an intelligent preference. Because the visitation schedule in the Hawaiian divorce decree was unworkable when the parents lived in different states, the court modified the decree, awarding the parents joint legal custody. Mary was given primary physical custody in North Dakota through the school year, and Steven was given primary physical custody in Colorado from June 1 to August 20 of each year. Steven was granted visitation on certain holidays and at "any special time" when he returned to North Dakota. Steven was also granted a fifteen-minute telephone visit on each Sunday, Tuesday, and Thursday from September through May. Mary appealed the amended decree and, in *Alvarez v. Carlson*, 474 N.W.2d 79 (N.D. 1991), we reversed the grandparent visitation and otherwise affirmed.

Steven again moved for change of custody in September 1993, asserting that circumstances had changed since the prior modification, that Daniel is now old enough to express an intelligent preference, and that Mary has repeatedly attempted to frustrate Steven's visitation with the children. The court appointed a guardian ad litem for the children. Following a hearing, the trial court concluded that Steven had failed to show changed circumstances warranting a change of custody and denied the motion. Steven appealed.

## I

Steven argues that the trial court erred in refusing to let Steven's counsel examine the guardian ad litem with leading questions. The parents stipulated to appointment of the guardian ad litem, and she was directed to make a recommendation to the court after interviewing both parents, the children, and others. Steven's counsel called the guardian ad litem as a witness and sought to examine her with leading questions. The trial court sustained Mary's objection that counsel could not lead his own witness.

The use of leading questions is governed by NDREv 611(c):

> *Leading Questions.* Leading questions should not be used on the direct examination of a witness except as may be necessary to develop the witness' testimony. Ordinarily, leading questions should be permitted on cross-examination. Whenever a party calls a hostile witness, an adverse party, or a witness identified with an adverse party, interrogation may be by leading questions.

Steven argues that, although he called the guardian ad litem, he was allowed by rule and statute to cross-examine her. NDREv 706(a) says:

> *Appointment.* The court, on motion of any party or its own motion, may enter an order to show cause why expert witnesses should not be appointed, and may request the parties to submit nominations. The court may appoint any expert witnesses agreed upon by the parties, and may appoint expert witnesses of its own selection.... A witness so appointed shall advise the parties of the witness' findings, if any; the witness' deposition may be taken by any party; and the witness may be called to testify by the court or any party. The witness is subject to cross-examination by each party, including a party calling the witness.

Because a guardian ad litem is not necessarily an expert, we do not decide in this case whether this evidence rule applies.

■ However, NDCC 14-09-06.3 specifically allows a party to call and cross-examine any person designated by the court to investigate and report on custody:

> *Custody investigations*
> *and reports—Costs.*
>
> 1. In contested custody proceedings the court may, upon the request of either party, or, upon its own motion, order

an investigation and report concerning custodial arrangements for the child. The court shall designate a person or agency responsible for making the investigation and report, which designees may include the county social service board, public health officer, school officials, and any other public agency or private practitioner it deems qualified to make the investigation.

\*　　\*　　\*　　\*　　\*　　\*

3. The court shall mail the investigator's report to counsel and to any party not represented by counsel at least thirty days before the hearing. The investigator shall make available to any such counsel or party the complete file of data and reports underlying the investigator's report and the names and addresses of all persons whom the investigator has consulted. A party may call the investigator and any person whom the investigator has consulted for cross-examination at the hearing. A party may not waive the party's right of cross-examination before the hearing.

Section 14–09–06.3 thus clearly and unambiguously authorized Steven to call the guardian ad litem as a witness and to cross-examine her with leading questions.

The court's conclusion that leading questions were inappropriate because the guardian ad litem was Steven's witness was erroneous. Steven's counsel, however, did not cite Section 14–09–06.3 or any other supporting authority to the trial court.

▪ We conclude that the trial court's erroneous ruling does not require reversal. "Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected. . . ." NDREv 103(a) (part). NDRCivP 61 adds:

No error in either the admission or the exclusion of evidence and no error or defect in any ruling or order or in anything done or omitted by the court or by any of the parties is ground for granting a new trial or for setting aside a verdict or for vacating, modifying or otherwise disturbing a judgment or order, unless refusal to take such action appears to the court inconsistent with substantial justice. The court at every stage of the proceeding must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties.

After Mary's objection was sustained, Steven's counsel continued his examination with nonleading questions and obtained favorable testimony from the guardian ad litem, including a recommendation that the court credit Daniel's stated preference to attend school in Colorado and to live with Steven. Steven has not demonstrated that any favorable evidence was kept out by the court's ruling; his argument goes entirely to the form of questioning permitted. Nor did Steven make an offer of proof at trial to demonstrate what additional evidence he hoped to get through the leading questions. *See* NDREv 103(a)(2); *Wagner v. Peterson,* 430 N.W.2d 331, 333 (N.D.1988). *See also Fronk v. Meager,* 417 N.W.2d 807, 812 (N.D.1987). Steven has failed to show that the court's ruling affected his substantial rights, and accordingly the error was harmless.

## II

Steven argues that the trial court erred in finding no significant change of circumstances to warrant a change of custody since the prior modification. Steven urges that Daniel's mature and intelligent preference to live with Steven, and Mary's continued attempts to frustrate visitation, each constitute a significant change of circumstances.

▪ A motion to modify custody requires a different analysis than an original custody proceeding. *Hagel v. Hagel,* 512 N.W.2d 465, 467 (N.D.1994). For an original custody proceeding, the trial court is concerned only with the best interests and welfare of the child, [*see Dalin v. Dalin,* 512 N.W.2d 685, 687 (N.D.1994); *Gould v. Miller,* 488 N.W.2d 42, 43 (N.D.1992) ], while modification of custody requires a two-stage analysis: (1) Has there been a significant change of circumstances since the prior custody determination? (2) Has the change of circumstances so adversely affected the child that it compels a change in custody to foster the child's best interests? *Hagel,* 512 N.W.2d at

467. Changed circumstances must be new facts that were unknown at the time of the prior custodial decree. *Leppert v. Leppert,* 519 N.W.2d 287, 292 (N.D.1994); *Hagel,* 512 N.W.2d at 467. Further, as *Delzer v. Winn,* 491 N.W.2d 741, 744 (N.D.1992), and *Blotske v. Leidholm,* 487 N.W.2d 607, 609 (N.D.1992), illustrate, the change of circumstances must be one that adversely affects the child.

■ A trial court's decision in a custody modification proceeding is a finding of fact reviewed under the clearly erroneous standard. *Johnson v. Schlotman,* 502 N.W.2d 831, 833 (N.D.1993). As *Johnson* states, a finding of fact is clearly erroneous if it is induced by an erroneous view of the law, if there is no evidence to support it, or if, although there is some evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been made.

Steven urges that fourteen-year-old Daniel's preference to live in Colorado with Steven was a change of circumstances since the prior modification, when the court disregarded the preference expressed by Daniel, then age ten. Daniel now wants to live in Colorado with Steven to take advantage of more course variety at school, better weather, and greater recreational opportunities, especially skiing. Steven asserts that, because Daniel is now older and mature enough to express an intelligent preference, the court erred in ignoring that preference.

■ Steven relies upon cases in which we have said that an intelligent preference expressed by a sufficiently mature child is a factor to be considered in determining custody. *See Barstad v. Barstad,* 499 N.W.2d 584, 588 (N.D.1993); *Novak v. Novak,* 441 N.W.2d 656, 658 (N.D.1989). Furthermore, the child's preference is generally entitled to greater weight when the child is older. *Barstad,* 499 N.W.2d at 588; *Mertz v. Mertz,* 439 N.W.2d 94, 96 n. 2 (N.D.1989). However, these cases indicate that the child's preference is more of a relevant factor in determining the *best interests* of the child. *See Barstad,* 499 N.W.2d at 588; *Novak,* 441 N.W.2d at 658. Distinguishing between the two stages in the modification analysis, we held in *Klose v. Klose,* 524 N.W.2d 94, 96 (N.D.1994),

and *Mertz,* 439 N.W.2d at 96, that, although the child's preference is relevant on best interests, it is less important on whether there has been a significant change of circumstances.

■ The reason for this difference in effect lies in the different reasons for the separate stages of the custody modification analysis. The first stage—significant change of circumstances—is premised upon the finality generally accorded to the judgments of a court, and upon a particular preference for continuity and stability in custodial placements. Accordingly, as *Delzer,* 491 N.W.2d at 244, *Gould,* 488 N.W.2d at 43, and *Blotske,* 487 N.W.2d at 609, illustrate, the moving parent has the burden to demonstrate that there has been a significant change of circumstances that so adversely affects the child that a change of custody is necessary.

■ Although a trial court retains jurisdiction to modify custody, the prior custodial decree is entitled to a great deal of deference and is presumed to be correct. A motion to modify it is akin to a request for a new trial based upon newly discovered evidence that could not have been discovered and produced at trial. *Schmidt v. Reamann,* 523 N.W.2d 70, 72 (N.D.1994). As *Hagel,* 512 N.W.2d at 467 (quoting *Orke v. Olson,* 411 N.W.2d 97, 100 (N.D.1987)), expresses, the requirement that the noncustodial parent demonstrate a significant change of circumstances "gives some finality to a trial court's original custody decision and helps ensure that a child is not bounced back and forth between parents 'as the scales settle slightly toward first one parent and then the other.' "

■ As a corollary to the finality given prior decrees, we have also stressed the importance of continuity and stability in the custodial relationship. Maintaining stability and continuity in the child's life, without harm to the child, is the most compelling factor when considering a motion for change of custody. *See Hagel,* 512 N.W.2d at 468; *Barstad,* 499 N.W.2d at 587; *Delzer,* 491 N.W.2d at 744; *Blotske,* 487 N.W.2d at 609. The child is presumed to be better off remaining with the custodial parent, and close

calls should be resolved in favor of continuing an existing custody. *Dalin,* 512 N.W.2d at 687; *Hagel,* 512 N.W.2d at 468. Thus, there is a doctrinal aversion to changing the custody of a happy child who has been living with one parent for a substantial time. *Delzer,* 491 N.W.2d at 744. The burden facing the parent seeking a change of custody was described in *Johnson,* 502 N.W.2d at 837 (Levine, J., concurring), as "a daunting, arduous task."

These policies shaped our recent opinion in *Klose,* where the children had expressed their preference to remain in Jamestown with their noncustodial father rather than move to Bismarck with their custodial mother. We held that the children's predictable preference to stay in the same community and schools did not "override the important need for the child to maintain a stable relationship with the custodial parent," and did not constitute a *significant* change of circumstances. *Klose,* 524 N.W.2d at 97. The rationale for the result in *Klose* was that there was no showing that the children's preferences were a significant change that adversely affected them.

■■■ Similarly, there has been no showing in this case that Daniel's stated preference to live in Colorado with Steven is a significant change that adversely affects Daniel. The record demonstrates, without contradiction, that Daniel is a normal, healthy child who is doing well in school and extracurricular activities, and who has a normal, happy relationship with his custodial mother. Daniel's reasons for wanting to live with his father are not based upon any great dissatisfaction with his current living arrangement. Rather, Daniel believes that there would be better photo labs and art classes at the school in Colorado, that the weather is nicer there, and that Colorado offers greater recreational opportunities. Those reasons are hardly the adverse developments needed to disturb the finality of the prior custodial decree and to overcome the presumption that a healthy, happy child should remain with the custodial parent.

■■■ We do not mean to imply that the child's preference is wholly irrelevant to the determination of change of circum-

stances. In *Klose,* 524 N.W.2d at 96, we clarified that a child's preference is a factor that may be considered when determining whether there has been a significant change of circumstances. The child's preference may be highly relevant if it is based upon a factor that itself constitutes a significant change of circumstances. Thus, if the child's preference to live with the noncustodial parent stems from, for example, allegations of abuse against the custodial parent, discord among members of a new step-family, or severe problems at school or in the community, the child's preference coupled with related evidence may demonstrate a significant change of circumstances.

■■■ Still, Steven argues, in effect, that any time a sufficiently mature child expresses a preference to live with the noncustodial parent, that fact alone constitutes, as a matter of law, a significant change of circumstances. That is not our law. That approach would effectively place the keys to the courtroom in the child's hands. Any time a child of sufficient age and maturity expressed a preference to live with the noncustodial parent, the first stage of the two-stage inquiry would be obviated, and the trial court would have to re-weigh the "best interests" factors to redetermine custody. We do not believe it is wise to place such power over parents into the hands of their children.

We have stressed, furthermore, that repeated motions for modification of custody should not "change custody back and forth as the scales settle slightly toward first one parent and then the other as their circumstances change." *Orke,* 411 N.W.2d at 100; *see also Hagel,* 512 N.W.2d at 467. A similar problem would arise if, each time the child's preference changed, it would be considered a significant change of circumstances. We have also cautioned that "a child's preference to live with the noncustodial parent may, in some instances, be motivated by goals and ambitions which undermine the significance of that preference and may, in fact, be detrimental to the child's best interests." *Mertz,* 439 N.W.2d at 97 n. 2; *see also Novak,* 441 N.W.2d at 658. That misgiving would be greatly magnified if the child's stated prefer-

ence was automatically made a significant change of circumstances, thereby self-opening the formidable first gate in the two-stage inquiry, and forcing reconsideration of the second-stage "best interests" factors.

We conclude that the trial court's finding that Daniel's preference did not constitute a significant change of circumstances was not clearly erroneous.

### III

■ Steven also argues that Mary's continued frustration of his visitation rights constitutes a significant change of circumstances. Our review is hampered by the trial court's failure to make an explicit finding on this question. Although we would ordinarily remand for an essential finding that is missing, we will not do so when, through inference or deduction, we can discern from the record the rationale for the result reached by the trial court. *E.g., Gould,* 488 N.W.2d at 44; *State v. Schmitz,* 474 N.W.2d 249, 251 n. 5 (N.D.1991); *Ness v. Ness,* 467 N.W.2d 716, 718 (N.D.1991). This is such a case.

The continuing visitation difficulties since the prior modification consist, for the most part, not of serious breaches of the trial court's orders, but rather represent Steven and Mary's incessant tendencies to convert minor discrepancies into full-blown battles, often culminating in resort to the police or the court. For example, in 1993 Steven attempted to pick up the children for his summer visitation early one June morning. When Mary asked Steven to come back later because the children were not done packing, Steven returned with a police officer and attempted to have Mary arrested for custodial interference. Steven also testified that some of the telephone visits were not made as scheduled, but the record indicates that those difficulties were often caused by conflicts with the children's extracurricular activities.

■ We do not downplay the seriousness of interference with visitation. We repeat our admonition in prior cases that such interference is not to be taken lightly and can be the basis for a change of custody if the child is seriously and adversely affected. *Blotske,*

487 N.W.2d at 610; *Miller v. Miller,* 305 N.W.2d 666, 672 (N.D.1981). The serious and burgeoning problem of visitation enforcement is being given increased attention. *See,* for example, Jessica Pearson & Jean Anhalt, *Enforcing Visitation Rights,* Judges' Journal, Spring 1994, at 3. However, changing custody to remedy visitation problems is a last resort. *See Blotske,* 487 N.W.2d at 610. This record does not demonstrate serious interference with visitation, but rather reflects more petty bickering between these estranged parents. The trial court obviously concluded that the conclusory evidence of visitation frustration in this case did not call for a finding that the children were so adversely affected that custody needed to be changed. We agree.

### IV

Having agreed that these visitation problems do not, at this time, warrant a change of custody, we are still uneasy about the effect the problems may be inflicting on the children. The preferred solution to visitation problems is clarification or restructuring of the visitation schedule. *Blotske,* 487 N.W.2d at 610. We believe it is appropriate in this specific case to remand to the trial court for reconsideration and refinement of the visitation schedule.

■ Because these parents have difficulty agreeing on specific times to transfer the children for visitation, we direct the trial court to set specific times and places for transfer of the children at the beginning and the end of each scheduled visitation. Because sporadic conflicts have disrupted scheduled telephone visits, the trial court may consider requiring Mary to give Steven advance notice if a regularly scheduled call will not be made, and to designate an alternate time for each regular call missed. Shifting costs for missed telephone visits to the interfering parent may also be considered. Finally, the court should consider requiring Steven to give a specified advance notice if he intends to exercise unscheduled visitation under the "any special time" clause in the decree.

We add a personal plea to these parents, in the hope that they will step back and see the

effect that their constant bickering over visitation has had upon Daniel and Christine. There is enough turmoil and uncertainty in a teenager's life without vengeful parents purposely putting their children in between their petty conflicts.

This record amply demonstrates that Mary and Steven each deeply love their children. It is tragic that they have let that love be eclipsed by meaningless disagreements that escalate into courtroom battles and police confrontations. Daniel and Christine have shown remarkable resilience and maturity in coping with these difficulties. We can only hope that, for the sake of the children, Mary and Steven will in the future display some like maturity.

We affirm the order denying Steven's motion to amend the decree. We remand to the trial court for reconsideration and clarification of the visitation schedule.

LEVINE, NEUMANN and SANDSTROM, JJ., concur.

VANDE WALLE, Chief Justice, concurring in result.

I am disturbed by the majority's move to confine a child's preference to an original-custody proceeding as opposed to a subsequent modification, at least for purposes of change of circumstances. This rigid confinement of the preference means a young child is between the proverbial rock and a hard place.

The young child's preference will be given little weight at an original-custody proceeding. *E.g., Barstad v. Barstad,* 499 N.W.2d 584 (N.D.1993). However, when the child matures to the point the courts will deign to give some weight to the child's preference, the child will be told its too late—this is a modification proceeding not an original-custody proceeding.

A child's preference is not controlling in any event. *Barstad, supra,* at 589 (Vande-Walle, C.J., dissenting); *Novak v. Novak,* 441 N.W.2d 656, 658 (N.D.1989) [Vande-Walle, J., concurring specially]. Therefore, even in determining whether there is a change of circumstances, I would not limit a mature child's preference to such extreme situations as "allegations of abuse against the custodial parent, discord among members of a new step-family, or severe problems at school or in the community." Such situations have as much to do with the child's best interest as they do a change in circumstances and would probably constitute a change in circumstances notwithstanding the child's preference. Nothing dictates that factors are exclusive, i.e., that a factor that affects a child's best interest cannot also be a factor affecting a change in circumstances. Rather, the mature child's preference should be considered by the trial court as a change in circumstances if there are persuasive reasons for that preference, persuasive enough to result in a change of custody.

Here, I agree the reasons for the preference are not persuasive enough to justify a change in custody. I concur in the result.

LEVINE, Justice, concurring.

I join in the majority opinion but write to tout the proposition that ordinarily, guardians ad litem should be treated as advocates of the children or investigators for the court, and not expert witnesses.

A trial court may, sua sponte, or at the request of either party, appoint a guardian ad litem to represent the interests of the child. NDCC § 14–09–06.4. It may also appoint an investigator of its choice to conduct an investigation and report its findings to the court. NDCC § 14–09–06.2. In this case, the court appointed the guardian ad litem and then directed her to conduct the interview, authorized by section 14–09–06.2, of the parents, children, and others, and make a recommendation as to the requested modification of the children's custody. Thus, the guardian ad litem was selected to fulfill both roles: investigator and advocate.

Guardians ad litem range in experience and training from professional child psychologists to interested lay persons and attorneys. Tara Lea Mulhauser, From "Best" to "Better": The Interests of Children and the Role of a Guardian Ad Litem, 66 N.D.L.Rev. 633, 634 (1990). Our law has carefully distinguished between expert testimony and guardian-ad-litem recommendations. *See,*

*e.g., McGurren v. S.T.*, 241 N.W.2d 690 (N.D. 1976) [remanding for expert testimony concerning future harm to infant from remaining with mother and refusing to give "special consideration" to recommendation of guardian ad litem]; NDCC § 14–17–15 [permitting court to order one or both parties to pay fees of "counsel, experts, *and* the child's guardian ad litem" (emphasis added)]. *Compare In Interest of R.W.B.*, 241 N.W.2d 546, 666 (N.D.1976) [applying law governing weight of expert testimony to guardian's ad litem testimony, but stopping short of accepting "the proposition that [a] guardian ad litem [is] an expert witness."].

I believe the better approach favors maintaining the separate legal status of guardians ad litem as advocates of the children they represent and as fact-finding investigators. Only if an individual guardian ad litem were to possess special skills, qualifications, or experience which the trial court were to acknowledge as conferring expert status, should a guardian ad litem be treated as an expert.