Rick **VAN DYKE**, Plaintiff and Appellee,

v.

Lynne **VAN DYKE**, Defendant and Appellant.

Civ. No. 950027.

Supreme Court of North Dakota.

Sept. 22, 1995.

Robert A. Feder (argued), Wold Johnson, P.C., Fargo, for plaintiff and appellee.

Elizabeth Jane Sundby (argued), Fargo, for defendant and appellant.

NEUMANN, Justice.

Lynne Van Dyke appeals from a change of custody order and contempt citation. We affirm in part, reverse in part, and remand for further proceedings.

Lynne and Rick were married in May of 1987. They are the parents of a son, Nicholas, born in August of 1987. They were divorced in January of 1990, and Lynne was awarded sole custody while Rick was granted a liberal visitation schedule. Almost immediately the tension between the parties disrupted the visitations.

This case is an example of what occurs when divorcing parents refuse to cooperate in fostering their child's relationship with the ex-spouse. The tragedy is that in the end it is Nicholas who bears the scars of his parents' bitterness.

Cooperation in the wake of Lynne's and Rick's divorce has been limited. Lynne has repeatedly interfered with or denied Rick's visitation. The latest interference, Lynne's unannounced move to Iowa, forms the immediate basis for the change of custody which eventually was granted. Rick's motion, while triggered by this latest incident, is also based on and supported by a number of prior events.

Lynne worked at the Kinney's Shoe Store in Fargo. In August 1994, she was offered a job managing a store in Iowa and was given one day to decide whether to accept. She did accept on August 9, 1994. She moved from Fargo to Iowa on August 17, 1994, and very shortly thereafter moved Nicholas to

live with her. Rick discovered Nicholas was no longer living in Fargo on August 23, 1994. On August 31, 1994, Rick moved for contempt proceedings and for a change of custody, and on September 15, 1994, he moved for permission to remove Nicholas from Iowa and return him to Fargo under NDCC section 14–09–07 (1991). Rick was unable to exercise his visitation rights while Nicholas was in Iowa.

Prior to this incident, there had been frequent court appearances by the parties. Lynne was held in contempt in 1989 for willfully and wrongfully withholding visitation from Rick. In 1990 there was another contempt motion filed by Rick, again for failure to comply with visitation. The disposition of this motion is unclear from our record. In November of 1991 Rick moved for change of custody, and a hearing was scheduled. Lynne failed to attend the hearing, and was again held in contempt and ordered to pay Rick's attorney's fees in the amount of $200. In December of 1991 the trial court found there was insufficient evidence to support a change of custody at that time. Finally, Lynne was held in contempt again following her move to Iowa.[1] That determination is one of the subjects of the current appeal.

In addition to her court orders, Lynne has established a history of antagonism regarding Rick's visitation with Nicholas. She and Nicholas have disappeared on days when visitation was to occur. She has made it impossible for Rick to contact her in order to arrange visitations. At one point she and Nicholas moved within Fargo, and Rick had to use the courts to force her to reveal her new address so he could pick up Nicholas for visitations. She refused to reveal her daycare provider to Rick so he could meet Nicholas there for visitation.

Even after Lynne returned to North Dakota for the hearing following her move to Iowa, the court had to order her to let Nicholas visit with Rick. At that point Lynne's move had deprived Rick of his visitation during the time Lynne and Nicholas had been absent from the state. In its change of custody order, the referee found

> Defendant testified that she does not wish to interfere with Plaintiff and Nicholas having a "full" relationship, but the court finds it anomalous to the stated end that not only did Defendant leave the jurisdiction with the child and move to Iowa without first obtaining permission or even telling Plaintiff, but that when she was brought back to this jurisdiction to appear in court, she still did not provide an opportunity for Nicholas to be with his father until directed to do so by this court.

The referee made other very specific findings regarding the changes which prompted his decision. The referee found it is Lynne's desire eventually to manage the Kinney's Shoe Store in Fargo. Prior to managing a store of that size, her employer requires she manage a small store such as the store in Iowa, followed by a medium sized store in some other location, all before she could return to Fargo.

The referee also found Rick is the one who has taken responsibility to foster his son's involvement in extracurricular activities. It is Rick who takes Nicholas to doctors for examinations and treatments. It is also Rick who takes Nicholas for haircuts and the like. They spend much recreational time together, and Rick adjusts his work schedule to accommodate his son's activities.

Lynne, on the other hand, withdrew her son from extracurricular activities because her employment wouldn't allow her the time. The court apparently concluded her past history, coupled with her increased work schedule and the fact that the move to Iowa removes her son from his support network of extended family and father, resulted in a significant change in circumstances requiring a change in custody. The court also considered that the move was over 600 miles from Fargo.

---

1. In addition to these contempt citations, Lynne was also held in contempt in April of 1992 for her willful refusal to appear before the court when ordered, as well as her refusal to pay attorney's fees ordered by the court. While this has little to do with her frustration of Rick's visitation, it further demonstrates her defiance of the court's orders.

■ The trial court, in the instant case, changed the custodial arrangement from one of sole custody remaining with Lynne to a joint custodial arrangement between the parents. Rick will exercise custody during the school year and Lynne's custody will occur during the summer.

Lynne challenges the court's findings, arguing no significant change of circumstances has occurred which requires the change of custody.

■ A trial court's decision to modify custody is a finding of fact subject to the clearly erroneous standard of review. *Barstad v. Barstad,* 499 N.W.2d 584, 587 (N.D. 1993). For the original placement of a child following a divorce, the trial court need only determine the best interests and welfare of the child. *Gould v. Miller,* 488 N.W.2d 42, 43 (N.D.1992). Upon a motion to modify that placement, however, the trial court must make a two-step analysis. *Id.* First, the court must determine whether there has been a significant change in circumstances since the original placement. *Id.* If there has, then the court must also determine whether that change compels a custodial change in the child's best interest. *Id.* The burden of establishing both lies squarely on the movant. *Id.*

Lynne argues the trial court concluded her move to Iowa was the only significant change in circumstances since the original custodial placement. Lynne's characterization of the trial court's findings is inaccurate. While the trial court relied on the move as one change in circumstances, it did not rely solely upon Lynne's move to support its findings. While it is possible the move alone might support such a finding, *see Gould,* 488 N.W.2d at 44, the referee's other findings and the extensive nature of the parties' record clearly support the finding that there has been a significant change of circumstances since the original custody determination. We conclude the trial court was not clearly erroneous in finding a significant change in circumstances had occurred since its original custody determination.

■ Lynne also argues the changes since the original custody determination do not compel a custodial change. Again we are guided by NDRCivP 52(a) and the clearly erroneous standard of review in determining this issue. *Barstad,* 499 N.W.2d at 587. While we might have concluded differently, our review does not allow us to supplant our judgment for that of the trial court.

The trial court made extensive findings. First, it recognized that permanence and continuity weigh heavily in favor of Lynne. However, the trial court found Rick participated in many of the caretaking duties with Nicholas, and was dedicated to his relationship with his son. In addition, Nicholas has done very well in the community and he is · doing quite well in school. Both his maternal and paternal grandparents are in the area. The court also found the relationship between Nicholas and Rick's son from a previous marriage was very close, and that Nicholas would benefit from their interaction. Rick has been the only one to encourage and enroll Nicholas in extracurricular activities, and has sacrificed the time required to ensure Nicholas' participation.

On the other hand, the court specifically found Lynne did not take the initiative for enrolling Nicholas in activities, taking him to the doctor, haircuts, and the like. This pattern would likely be exacerbated by her increased work schedule, and further complicated by the removal of Nicholas from his extended family and from his father, who have taken up the slack in the past.

■ The court also considered Lynne's *persistent frustration of Rick's visitation* as a factor. While we agree parental frustration of visitation should not be the sole factor for a change in custody, it nevertheless may be considered. *Gravning v. Gravning,* 389 N.W.2d 621, 623 (N.D.1986). It has been urged, and we agree, that prior to resorting to a change in custody other methods should be tried to remedy a parent's misbehavior. *See Gravning,* 389 N.W.2d at 626 (J. Levine dissent) (suggesting the normal means of enforcing visitation is by contempt proceedings or modification proceedings). In the instant case this was repeatedly tried. When frustration of visitation becomes this problematic, it is proper to consider it as a factor to

help determine whether a change in custody is required.

■ The trial court's findings are supported by the record. We cannot say the finding that a significant change of circumstances required the custodial modification is clearly erroneous.[2]

■ Lynne also argues she was willing to return to Fargo if permission for her move was denied, and therefore her move should not have been considered. Lynne's offer to move back is of limited legal significance. At the time of the proceeding there was no question she had moved. That move was one of the facts before the judicial referee, and one of the facts upon which his findings appropriately were based. Lynne's mere offer to return, while of some relevance, was hardly evidence sufficiently compelling to eliminate the fact of her move. The trial court did not err in choosing not to give Lynne's offer to return the compelling weight she now claims it merits.

■ Lynne's final point on appeal consists of two parts. First she argues the trial court could not have found her in contempt because no order to show cause or warrant of attachment was issued. She claims this failure breached the requirements of NDCC section 27–10–07 (Supp.1993). The second portion of her argument relates to the referee's ordering her to pay Rick's attorney's fees in the amount of $750 to purge herself of the contempt citation. She argues no evidence was ever presented to show $750 was reasonable and appropriate.

A close reading of NDCC section 27–10–07 reveals Lynne's procedural argument must fail. Section 27–10–07 provides:

> **Order to show cause or warrant of attachment for contempt not committed in presence of judge.** In addition to the procedure set out in section 27–10–01.3, when an act punishable as contempt is not committed in the immediate view and presence of the court, the court, upon being satisfied of the commission of the offense, *may:*
>
> 1. Order the accused to show cause at a specified time and place why the accused should not be punished for the alleged offense; or
>
> 2. Issue a warrant of attachment directed to the sheriff of any county where the accused may be found commanding the sheriff to arrest and bring the accused before the court at a specified time and place to answer for the alleged offense.

NDCC § 27–10–07 (emphasis added). Section 27–10–07 is not mandatory, it is permissive. It suggests two separate vehicles by which judges may bring alleged contemnors before them and provide for a hearing on the contempt. When this section is compared to its predecessor it is clear the statute has changed. Its predecessor was directive rather than permissive in nature. It read:

> **Order to show cause or warrant of attachment for contempt not committed in presence of judge.** When an act punishable as a criminal or civil contempt by a court of record of this state is not committed in the immediate view and presence of the court, the court, upon being satisfied by affidavit of the commission of the offense, *shall:*

---

**2.** The dissent suggests visitation violations cited by Rick in support of his July 2, 1990, motion for change of custody were "rejected" by the referee, and somehow no longer can be counted as part of a pattern of such violations, simply because the referee did not grant the 1990 motion. In fact the referee did not find such violations had not occurred, but only that Rick had not proved a material change, and had not proved the child's best interests would be served by a change of custody. Rather than making any findings as to the specific allegations, the referee placed emphasis on the parties' lack of cooperation, and required the guardian ad litem to report any visitation violations that might come to

light in the following twelve months. It appears the referee did exactly as we have suggested, that is, used methods other than change of custody to try to resolve a custody dispute.

The dissent's argument that old allegations cannot be relied upon as part of the basis for finding a pattern of violations is particularly troubling in light of our stated preference for using methods short of change of custody in such cases. If an uncooperative custodial parent's record were to be wiped clean after every motion dealing with visitation violations, proving a pattern of such violations sufficient to justify a change of custody would become nearly impossible.

1. Make an order requiring the accused to show cause at a time and place therein specified why he should not be punished for the alleged offense; or

2. Issue a warrant of attachment directed to the sheriff of any county where the accused may be found commanding him to arrest the accused and bring him before the court forthwith or at a time and place therein specified to answer for the alleged offense.

NDCC § 27–10–07 (1991) (amended 1993) (emphasis added). Lynne's argument that the contempt citation is invalid because neither an order to show cause nor a writ of attachment was issued fails. Since Lynne received notice and a hearing on the contempt we assign no error.

 We are disturbed, however, by the trial court's finding Lynne in contempt "for her willful violation of § 14–09–07 N.D.C.C." In its usual sense, contempt comprehends a despising of the authority, justice, or dignity of a court. 17 C.J.S. *Contempt* § 1 (1963). It is not normally invoked to punish past violations of a statute. In North Dakota contempt of court is defined as:

a. Intentional misconduct in the presence of the court which interferes with the court proceeding or with the administration of justice, or which impairs the respect due the court;

b. Intentional nonpayment of a sum of money ordered by the court to be paid in a case where by law execution cannot be awarded for the collection of the sum;

c. Intentional disobedience, resistance, or obstruction of the authority, process, or order of a court or other officer including a referee or magistrate;

d. Intentional refusal of a witness to appear for examination, to be sworn or to affirm, or to testify after being ordered to do so by the court;

e. Intentional refusal to produce a record, document, or other object after being ordered to do so by the court; or

f. Any other act or omission specified in the court rules or by law as a ground for contempt of court.

NDCC § 27–10–01.1(1) (Supp.1993). This statutory definition does not contemplate use of contempt as a remedy for past statutory violations. Although contempt powers are inherent to courts, the legislature may limit, and in North Dakota has limited, the categories to which contempt orders may apply. *Blaesing v. Syvertson,* 532 N.W.2d 670, 671 (N.D.1995). For this reason we hold the contempt order against Lynne was issued in error.

 The trial court ordered "[t]hat the Defendant shall pay attorney's fees to Plaintiff in the amount of $750.00 within 30 days to purge herself of Contempt of Court." Apparently the trial court sought to award attorney's fees in whole or in part to Rick. It is within the trial court's authority to award attorney's fees in litigation concerning marital obligations between former spouses. *Pozarnsky v. Pozarnsky,* 494 N.W.2d 148, 151 (N.D.1992). However, such an award requires specific findings. *Id.* The awarding of attorney's fees must be supported by evidence setting forth information regarding the parties' financial conditions and needs. *Id.* The principal standards to be considered are one parent's need and the other's ability to pay. *Id.* No such evidence is present in this record. We therefore remand the question of attorney's fees for reconsideration.

 We also note that footnote one of appellee's brief fails to conform with NDRAppP 28(a)(4) and (5). In that footnote Rick's attorney chronicles allegations regarding Lynne's behavior without appropriate references to the record. *Id.* We have reviewed the record and conclude it cannot support these allegations. Inappropriate attempts to supplement the evidentiary record at the appellate level cannot be condoned. Therefore, consistent with Rule 13, NDRAppP, we deny Rick costs on this appeal as a sanction for his actions. *See Varda, Inc. v. Insurance Co. Of North America,* 45 F.3d 634 (2d Cir.1995).

Affirmed in part, reversed in part, and remanded.

VANDE WALLE, C.J., and SANDSTROM, J., concur.

LEVINE, Justice, dissenting.

I would hold the finding that a change in custody is in the best interests of the child in this case to be clearly erroneous because it was induced by an erroneous view of the law, and any significant change of circumstances does not "compel or require . . . a change of custody." *Barstad v. Barstad,* 499 N.W.2d 584, 587 (N.D.1993).

It is clear to me that the reason for the change of custody is not Lynne's move, but Lynne's "contemptuous conduct" in moving to Iowa City without first obtaining court approval. I say that because a custodial parent's move to another state, by itself, is not a changed circumstance that requires a change in custody. *Barstad,* 499 N.W.2d at 587, citing *Gould v. Miller,* 488 N.W.2d 42, 44 (N.D.1992), especially when the move is one to gain economic advantage.[1] *See Hedstrom v. Berg,* 421 N.W.2d 488 (N.D.1988).

That is so because of the primary importance of custodial stability. *See Silseth v. Levang,* 214 N.W.2d 361 (N.D.1974). Maintaining "continuity and stability in the custodial relationship" is the "most compelling factor" when considering a change of custody. *Alvarez v. Carlson,* 524 N.W.2d 584, 589 (N.D.1994). "The child is presumed to be better off remaining with the custodial parent. . . ." *Id.* Overcoming this presumption is, and should be, a difficult task for the noncustodial parent. *See Johnson v. Schlotman,* 502 N.W.2d 831, 837 (N.D.1993) (Levine, J., concurring) [stating that "noncustodial parents challenging custody" face "a daunting, arduous task."]. Ultimately, "[t]he trial court should change custody only when the reasons for transferring custody substantially outweigh the child's stability with the custodial parent." *Dalin v. Dalin,* 512 N.W.2d 685, 687 (N.D.1994).

While it may be advantageous for children to stay in the same town with friends and noncustodial parent, the desire for environmental stability does not outweigh the presumption in favor of custodial stability. *See Klose v. Klose,* 524 N.W.2d 94 (N.D.1994); *Alvarez,* 524 N.W.2d at 590; *Hagel v. Hagel,* 512 N.W.2d 465 (N.D.1994); *accord Dalin,* 512 N.W.2d at 687; *Barstad,* 499 N.W.2d at 587.

Treating this case for the moment as though Lynne had properly requested permission to move, she would have had to prove her move was in the child's best interests. *McRae v. Carbno,* 404 N.W.2d 508 (N.D.1987); *Olson v. Olson,* 361 N.W.2d 249 (N.D.1985). Custodial stability and economic advantage in conjunction with an extended summer vacation and other holiday visitation schedule for Rick would fully support the move. *See Hedstrom,* 421 N.W.2d at 490; *McRae,* 404 N.W.2d at 511–12 (Meschke, J., dissenting); *see also Holder v. Polanski,* 111 N.J. 344, 544 A.2d 852, 856–57 (1988) [custodial parent need only show a "sincere, good-faith reason" for move and court considers whether move is inimical to best interests of child and whether it will "adversely affect" visitation rights. "Not every change in a visitation schedule will prejudice those rights. . . ."].

Assuming, then, that the referee properly considered the importance of maintaining the stability the child enjoys with the custodial parent and the economic gain derived from the new job, he could not, in my view, base a change of custody on the fact that Lynne's move would frustrate Rick's visitation. *Thomas v. Thomas,* 446 N.W.2d 433 (N.D. 1989). *See also Holder,* 544 A.2d at 857. Nor could he change custody on the basis that Lynne's work interfered with her ability to take Nicholas to the ballpark and the barber. Aside from the obvious fact that Lynne, as a custodial parent, was responsible for the daily nurture, care, supervision and direction of Nicholas, with which no fault was found (aside from the absence of extra-curricular activities), I assume the referee surely recognized the overriding importance and success of Lynne's day-to-day educational, moral and physical nurture and care of the child as contrasted with Rick's contributions to the child's participation in extra-curricular athletics and haircuts. *See Barstad,* 499 N.W.2d at 588. I, therefore, am confident

---

1. Rick earns about $45,000 a year. Lynne earned $16,000 a year in Fargo and about $32,000 a year in Iowa. Lynne was on public assistance for almost a year before she found work with her current employer.

that the referee determined to change custody primarily, if not exclusively, to punish Lynne for her unapproved move to Iowa, in part because of her alleged past frustration of visitation.

The referee found that by her move, Lynne was determined to "make visitation difficult if not impossible." However, the record does not support this finding.[2]

The only past interference with visitation that was proved in court occurred on September 15, 1989, when Rick was unable to exercise visitation on one occasion because Lynne and the child were not at home when he arrived to pick up the child. Lynne claimed that she had requested that Rick have visitation on weekends corresponding with her employment schedule and that her schedule changed from the first and third weekends to the second and fourth weekends and that Rick refused to accommodate this change. She asked that the alternating weekend schedule begin over with September 8, 1989, as the first weekend.

The referee held Lynne in contempt of court and the trial court confirmed. This 1989 order is the only finding of interference with visitation and the only time Lynne was found to be in contempt for frustration of visitation. All the other alleged past visitation violations cited by the majority, as justifying a change of custody, are taken from Rick's affidavits that accompanied a motion dated July 2, 1990, in which Rick sought a change of custody, claiming visitation interferences and other allegations, including Lynne's failure to provide him with the name and address of her day-care provider. The referee appointed a guardian ad litem who recommended not only no change in custody, but also that the parties, "particularly [Rick] cease manipulating the child in regard to the custody issue." In denying the motion to change custody,[3] the referee rejected all of Rick's claims of a "pattern of visitation deni-

al" (as well as Lynne's allegations that Rick was harassing her) and found also that Rick had coached the child to tell the guardian ad litem he wanted to live with Rick. That the majority should detail those very same allegations of misconduct that took place, if at all, before the December 1991 custody adjudication and were rejected by the referee, and elevate them to "facts" that justify the present change of custody is startling.

It is obvious from the referee's December 1991 findings that he rejected Rick's allegations of visitation interference. Specifically, the referee found:

"IX

"That at the heart of this dispute is visitation; that the Plaintiff [Rick] alleges a pattern of denial of visitation; that the Defendant [Lynne] alleges that no such pattern of denial exists and that Plaintiff is in fact fabricating this charge both for purposes of harassment and to bolster an otherwise thin claim to custody; that although only one side can be telling the truth in this matter, neither is clearly more credible than the other and neither presents significant support evidence for their respective position."

The majority, however, suggests that the referee chose not to make findings on Rick's visitation interference allegations because he wanted to use "methods other than a change of custody to try to resolve a custody dispute." Contrary to the majority's suggestion, the referee did make findings: he found no "significant support" for the visitation interference allegations. Nor would a change of custody have been mandatory or appropriate had the referee found the visitation interference allegations to be credible. *See Blotske v. Leidholm*, 487 N.W.2d 607 (N.D. 1992). The fact is that the referee did not find Rick's evidence of visitation interference "significant." That tells me that the majori-

---

**2.** The majority's statement that Lynne "has repeatedly interfered with or denied Rick's visitation" is unfortunately blatantly wrong. It overstates the referee's findings and it is contrary to the referee's prior rejection of the very evidence the majority relies on.

**3.** The majority says the record is unclear over the disposition of the July 2, 1990, motion. I find no lack of clarity. The motion was not disposed of until December 27, 1991, because of the delay engendered by the appointment of a guardian ad litem and the guardian's investigation and report.

ty is reaching, to say the least, when it relies on the very evidence the referee found not "significant."

The majority also notes that the referee, in his 1991 order, instructed the guardian ad litem to report on any further visitation problems. And so he did. But the guardian made no such report, nor is there any evidence of visitation problems between the conclusion of the previous custody action and the initiation of the present action—a span of almost three years. The record shows, however, that in the same period, the court was forced to threaten Rick with contempt three times because he failed to make child support payments.

The only adjudicated visitation frustration took place in 1989, a long time ago. Can it be seriously disputed that one instance of interference with visitation cannot serve as justification, even in part, for changing custody? Indeed, even if it were not so remote or isolated an event, we have held that a recent pattern of frustration of visitation rights is not enough in itself to warrant a change of custody. *Miller v. Miller*, 305 N.W.2d 666 (N.D.1981); *Ebertz v. Ebertz*, 338 N.W.2d 651 (N.D.1983). Problems with visitation do not justify a change of custody unless there is a finding that there has been a negative effect on the best interests of the child. *Blotske*, 487 N.W.2d at 610. Even when visitation is a problem, less drastic remedies than changing custody should be considered first. *Id.* Here, the single prior visitation problem found to have occurred took place before the referee imposed his contempt sanction in 1990. That sanction obviously worked. Rick acknowledges that since 1990, he has not missed visitation once. So, when the dust settles, we are left with the "contemptuous" move to Iowa.

A move without court approval is forbidden. But, Lynne's unauthorized move was neither vindictive nor otherwise in bad faith. She would earn twice as much in Iowa City as she did in Fargo. The job offer required an immediate transfer and she jumped at it. There is nothing in this record to suggest that the reason for Lynne's move was anything but economic. Nor is there any suggestion that Rick offered, or Lynne refused, additional child support to enable Lynne to stay in Fargo and forgo doubling her modest income.

Transfer of custody only should be used as a last resort "to remedy a recalcitrant parent's habitual interference with visitation." *Johnson* 502 N.W.2d at 837 (Levine, J., concurring). One prior instance of visitation interference five years before, and a hasty move out of state to grab an opportunity to double one's income, do not make for either "a recalcitrant parent" or "habitual interference with visitation." A move without court approval is a serious affront, but the sanction for that violation should not be a change of custody, at least under the circumstances of this case.

I would reverse and reinstate custody in Lynne.

MESCHKE, J., concurs.